UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELSA ROBERTS, | No. 2:12-cv-2506-CKD |
| Plaintiff, | |
| v. | ORDER |
| KAISER FOUNDATION HOSPITAL, et al., | |
| Defendants. | |

Defendants' motion for summary judgment came on regularly for hearing on February 4, 2015.[1]  Andrea Miller and Janet Meredith appeared for plaintiff.  Matthew Hawkins appeared for defendants.  Upon review of the documents in support and opposition, upon hearing the arguments of counsel, and good cause appearing therefor, THE COURT FINDS AS FOLLOWS:

/////

/////

/////

/////

_____

[1] After the parties consented to the jurisdiction of a United States Magistrate Judge for all purposes pursuant to 28 U.S.C. § 636(c) (ECF Nos. 17, 21), the action was reassigned to the undersigned for all further proceedings and entry of final judgment.  (ECF No. 24.)

1      I.    <u>Relevant Facts</u>[2]

All facts referred to below are not genuinely disputed by the parties unless otherwise noted.[3]  The court does not cite to any facts that are irrelevant to resolution of the pending motion.

Plaintiff was hired by The Permanente Medical Group, Inc. ("TPMG") in 2002 as a part-time, on call lab assistant and became a permanent part-time employee in 2003.  While employed at TPMG, plaintiff was a member of the SEIU Union.  The Union had a collective bargaining

---

[2] Both plaintiff and defendants have filed evidentiary objections.  Plaintiff filed objections to certain factual assertions made in defendants' statements of undisputed fact numbers 22 and 34. (ECF No. 37-4.)  However, plaintiff attacks only defendants' phrasing of its factual assertions and not the evidence underlying these factual assertions.  Statements of undisputed facts are not evidence, the admissibility of which can be challenged under the Federal Rules of Evidence, but summaries of the material facts contained in the cited evidence, which the court reviews independently.  <u>See</u> Local Rule 260.  Accordingly, these objections are not well taken and are overruled.  Defendants filed twenty-six evidentiary objections to portions of the declarations of Jessica Roberts and Diane Horn.  (ECF No. 41.)  For purposes of this motion, the testimony provided by Jessica Roberts and Diane Horn in the objected-to portions of these declarations is irrelevant.  Accordingly, the court sustains defendants' objections based on relevance, namely objection numbers 1, 2, 3, 4, 5, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 19, 20, 21, 24, and 26.  Furthermore, defendants' objection numbers 17 and 23 are sustained on the grounds that the objected-to statements are inadmissible hearsay.  Defendants' remaining objections are overruled.  Plaintiff also filed objections to defendants' reply briefing, asserting that the court should disregard defendants' reply in its entirety because it asserts new arguments and presents new evidence not first raised in their motion for summary judgment.  (ECF No. 42.)  However, these objections provide no indication of what arguments defendants have asserted in their reply that were not first asserted in their motion.  Furthermore, even if the court were to disregard defendants' evidence filed in support of their reply, the omission of such evidence would not materially affect the outcome of the present motion.  Accordingly, plaintiff's request to disregard defendants' reply is denied.

[3] In support of the motion for summary judgment, defendants submitted requests for judicial notice of plaintiff's first amended complaint filed in the present action and plaintiff's administrative complaints filed with the California Department of Fair Employment and Housing and the U.S. Equal Employment Opportunity Commission in connection with the present action. (ECF No. 34-3.)  The court grants defendants' request of these documents because they are properly subject to judicial notice under Federal Rule of Evidence 201.  <u>See</u> <u>Biggs v. Terhune</u>, 334 F.3d 910, 916 n.3 (9th Cir. 2003) ("Materials from a proceeding in another tribunal are appropriate for judicial notice."), <u>overruled on other grounds</u>, <u>Hayward v. Marshall</u>, 603 F.3d 546, 555 (9th Cir. 2010); <u>Clifford v. Regents of Univ. of California</u>, 2012 WL 1565702, at *5 (E.D. Cal. Apr. 30, 2012) (taking judicial notice of plaintiff's original and amended complaints "because those documents are already before the Court").

1  agreement ("CBA") in place with TPMG, which required that employees bid for open jobs and

2  that open positions be awarded on the basis of seniority.

3     While working on December 1, 2009, plaintiff accidentally stuck herself with a needle she

4  had just used to draw blood from a patient.  The patient told plaintiff that he had HIV and

5  Hepatitis C.  Plaintiff was then taken to the emergency room where she received care.  As a result

6  of this incident, plaintiff began suffering from nightmares, anxiety, and other emotional distress

7  with regard to the patient and whether she had contracted his diseases.  However, it was later

8  determined that plaintiff had not contracted HIV or Hepatitis C.

9     Following her injury, plaintiff briefly returned to work, but this caused her emotional state

10  to worsen.  Plaintiff submitted a request for leave under the Family Medical Leave Act

11  ("FMLA"), which was approved beginning January 5, 2010.  Plaintiff continued to receive

12  extensions for her leave under the FMLA through August 1, 2010, but was denied an additional

13  requested extension because she did not actively work at least 1,250 hours during the required

14  period.  Nevertheless, plaintiff was granted an extension of her leave.  Plaintiff then returned to

15  work and worked for the majority of October 2010 through August 2011.

16     On August 17, 2011, an investigatory interview took place between plaintiff and

17  defendant Nunes regarding plaintiff's recent absences.  During this meeting, plaintiff stated that

18  she had gone to a doctor's appointment during her absence on July 21, 2011, and that her other

19  absences were covered as FMLA leave.  On September 20, 2011, Nunes held a follow up

20  attendance meeting with plaintiff.  During this meeting, Nunes told plaintiff that she had

21  contacted Athens, plaintiff's workers' compensation administrator, and was told that plaintiff had

22  gone to a doctor's appointment on July 20, 2011, not July 21, 2011, as plaintiff had told her

23  during their previous meeting.  Nunes also warned plaintiff that if such absences occurred in the

24  future, plaintiff could be terminated.  The absences addressed during these two meetings were

25  ultimately found to be protected absences.  On September 27, 2011, plaintiff submitted an injury

26  report noting that plaintiff was suffering from a great deal of anxiety after her September 20, 2011

27  meeting with Nunes.

28

1        On October 10, 2011, Dr. Hellman, plaintiff's treating psychologist who also worked for

2 TPMG, submitted a work status report to TPMG stating that he had been treating plaintiff and

3 that plaintiff could return to work on the condition that she either be "restricted from visual/verbal

4 contact and from being directly supervised by current supervisor," or be relocated to an alternate

5 worksite.  (Hellman Deposition, Exh. 143; Hiatt Declaration ¶ 7, Exh. 2.)  The report further

6 stated that if neither of these accommodations could be made, then plaintiff should be regarded as

7 unable to return to work until October 31, 2011.  TPMG believed that Dr. Hellman intended the

8 restricted contact condition to mean that plaintiff could be accommodated only if she had

9 absolutely no contact with her supervisor Nunes, including even incidental contact, while at work.

10 (Hanson Deposition 133:1-11.)  Plaintiff contends that Dr. Hellman actually meant that plaintiff

11 only be restricted from direct supervision by Nunes, and that incidental physical and verbal

12 contact with Nunes would be permitted.  (Hellman Deposition 49:14-51:12.)

13        TPMG determined that it could not provide plaintiff with the request to limit her contact

14 with Nunes because the location of plaintiff's work site and the fact that Nunes regularly moved

15 between buildings during her shift; this precluded TPMG from effectively providing such an

16 accommodation.  TPMG further determined that it could not provide plaintiff with a transfer to

17 one of its other work sites because of plaintiff's work hours and the fact that the CBA's seniority-

18 based job bidding system precluded TPMG from simply placing plaintiff into an open position at

19 another site.  Defendant Carretti called plaintiff on October 13, 2011 and informed her that

20 TPMG could not provide her with her requested accommodations.

21        On October 18, 2011, Dr. Hellman submitted a second work status report to TPMG,

22 which contained the exact same requested accommodations provided in the October 10, 2011

23 report.  The report further indicated that if either of the requested accommodations could not be

24 provided, then plaintiff would be considered unable to return to work until November 20, 2011.

25 On November 2, 2011, Heather Hiatt, a disability case manager for TPMG, called and left a

26 message for Dr. Hellman seeking clarifications regarding the October 18, 2011 report he had

27 submitted.  Specifically, Hiatt noted that the report did not provide any information concerning

28 plaintiff's work limitations and requested that Dr. Hellman provide clarification as to what

1   plaintiff's actual restrictions were.  Dr. Hellman responded on November 9, 2011 and told Hiatt

2   that he would not comment on plaintiff's restrictions because plaintiff had been transferred to the

3   care of another doctor.  Dr. Hellman had referred plaintiff to Dr. Greenberg, an outside

4   psychologist, due to TPMG's change in policy that precluded TPMG employees from providing

5   services to TPMG employees claiming conditions related to their work for TPMG.

6          On November 18, 2011, Dr. Greenberg provided TPMG with a note stating that plaintiff

7   was under his care and that she was unable to return to work until December 20, 2011.  On

8   November 23, 211, defendant Hanson sent an email to two other TPMG employees, Carrie Miller

9   and Al Donaldson, explaining Dr. Greenberg's note.  Hanson also added at the end of the email

10  that "Kaiser HAS to develop a way of dealing more effectively with these sorts of, what I

11  consider to be bogus, time off notes."  (Hanson Deposition, Exh. 13 (emphasis in original).)

12         On December 19, 2011, Hiatt sent plaintiff a letter stating that TPMG had a return to work

13  program that would allow plaintiff to engage in modified work while she recovered.  The letter

14  also asked plaintiff to "provide an updated certification from [her] medical care provider

15  indicating [her] work restrictions by, December 30, 2011, to begin the [return to work] process."

16  (Hiatt Declaration, Exh. 5.)  The letter requested that plaintiff provide such information "if [it

17  was] applicable."  (Id.)  On December 23, 2011, Dr. Greenberg faxed Hiatt a verification of

18  treatment ("VOT") letter stating that plaintiff was under his care and unable to return to work

19  until February 1, 2011, at which time he would reevaluate her.  On December 29, 2011, plaintiff

20  called Hiatt in response to Hiatt's December 19, 2011 letter.  During this conversation, Hiatt

21  explained that TPMG's return to work program was available and if plaintiff's doctor indicated

22  that plaintiff could return to work with restrictions, TPMG would work with plaintiff to determine

23  whether plaintiff could be accommodated.  Plaintiff replied that she was unable to return to work

24  at that time.

25         Plaintiff submitted to TPMG a VOT letter dated January 23, 2012 from Dr. Meisner, one

26  of plaintiff's treating physicians, stating that plaintiff was ill and unable to return to work through

27  March 23, 2012.  Plaintiff submitted another VOT letter dated February 28, 2012 from Dr.

28  Greenberg stating that plaintiff was unable to return to work through April 1, 2012.  Plaintiff

1   submitted fourth VOT letter dated March 12, 2012 from Dr. Meisner stating that plaintiff was

2   unable to return to work through May 11, 2012 due to a serious medical condition.

3       On March 20, 2012, Hiatt sent plaintiff another letter regarding TPMG's return to work

4   program and offered to work with plaintiff to determine whether TPMG could provide plaintiff

5   with a reasonable accommodation.  The letter noted that while the offer had already been

6   extended to plaintiff, Hiatt wanted to offer it again in case plaintiff's "situation ha[d] changed."

7   (Hiatt Declaration, Exh. 11.)  Plaintiff then submitted another VOT letter dated May 7, 2012 from

8   Dr. Greenberg stating that plaintiff was unable to return to work until June 19, 2012.  Over the

9   next three months, plaintiff submitted three more VOT letters from Dr. Greenberg; the last of the

10  three letters indicated plaintiff's inability to return to work until October 15, 2012.

11      On August 30, 2012, Hiatt sent plaintiff a third letter following up on plaintiff's status.

12  Hiatt reiterated TPMG's offer to work with plaintiff to determine her limitations and whether it

13  could provide plaintiff with a reasonable accommodation.  The letter also informed plaintiff that

14  TPMG would need "an understanding of [plaintiff's] limitations" in order to best assist her in

15  returning to work.  (Hiatt Declaration, Exh. 16.)  The letter further informed plaintiff that her

16  leave would expire on November 5, 2012 pursuant to the terms of the CBA and stated that Hiatt

17  would like to work with plaintiff prior to that time to determine a reasonable accommodation.

18  Finally, the letter stated that plaintiff would remain on medical leave of absence while TPMG

19  "await[ed] clarification of [her] restrictions."  (Id.)  Hiatt also enclosed a form with the letter for

20  plaintiff to give to her physician that requested a statement of plaintiff's limitations for purposes

21  of determining a possible accommodation.

22      Plaintiff submitted another VOT dated October 11, 2012 from Dr. Greenberg stating that

23  plaintiff would be unable to return to work until January 1, 2013.  On October 24, 2012, plaintiff

24  contacted Andrew Jackson, a disability case manager at TPMG, and told him that she was

25  permanently disabled and was in the process of applying for Social Security disability benefits.

26  Jackson shared this information with Hiatt.

27      On October 31, 2012, Hiatt sent plaintiff a fourth letter requesting that plaintiff provide a

28  statement of her work limitations so that TPMG could work with her in assessing a reasonable

1   accommodation.  The letter further stated that if plaintiff wanted to engage in the interactive

2   process, she would need to contact Hiatt by November 7, 2012.  Hiatt also wrote that if she did

3   not hear from plaintiff by that date, then she would assume that plaintiff did not want to engage in

4   the interactive process and that TPMG would cease its efforts to engage with her.  (Hiatt

5   Declaration, Exh. 19.)  Plaintiff called Hiatt concerning this letter on November 7, 2012.  During

6   this conversation, plaintiff stated that she was confused and did not know what was going on.[4]

7   Plaintiff also stated that she "d[id] not want to engage in [the interactive] process" and that Hiatt

8   should talk to plaintiff's doctors.  (Hiatt Declaration, Exh. 20.)  On November 15, 2012, Hiatt

9   sent plaintiff a letter reiterating what was said during the November 7, 2012, conversation,

10  including that plaintiff was "not interested in the interactive process or reasonable

11  accommodation."  (Hiatt Declaration, Exh. 21.)  The letter also instructed plaintiff to contact her

12  doctor so she could obtain information regarding her restrictions by no later than November 23,

13  2012.  Finally, Hiatt wrote that if such information had not been provided by that date, then

14  TPMG would assume that plaintiff was not interested in pursuing the interactive process.

15  Plaintiff did not respond to Hiatt's letter by November 23, 2012.

16          On December 10, 2012, Dr. Greenberg sent TPMG a letter stating that plaintiff's

17  condition had not improved significantly despite treatment, plaintiff currently could not return to

18  work with or without limitation, and he was continuing to work with plaintiff with the hope to

19  return her to work at TPMG in another setting and under a different supervisor.  Plaintiff

20  submitted another VOT letter dated December 28, 2012 from Dr. Greenberg stating that plaintiff

21  would be unable to return to work until February 1, 2013.  No further notes or VOT letters were

22  provided by plaintiff's doctors.

23          While plaintiff's contractual leave under the CBA ended on November 7, 2012, TPMG

24  extended plaintiff's leave until January 8, 2013, when it terminated plaintiff's employment.

25          On February 20, 2013, plaintiff filed her first amended complaint against defendants,

26  alleging claims for violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101

27  

28  [4] The court notes that plaintiff's claim that she was "confused" is somewhat belied by the fact that
she filed a well-stated complaint in pro per in this action on October 5, 2012. ECF No. 1.

1  et seq., and its California counterpart, the Fair Employment and Housing Act ("FEHA"), Cal.

2  Gov't Code § 12940 et seq., for failure to reasonably accommodate her disability and engage in

3  the interactive process; intentional infliction of emotional distress; violations of the Family and

4  Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., and its California counterpart, the

5  Family Rights Act ("FRA"), Cal. Gov't Code § 12945.2, for denying plaintiff's request to

6  exercise her right to FMLA payment; and wrongful termination in violation of public policy.

7       II.     Summary Judgment Standards

8       Summary judgment is appropriate when it is demonstrated that there "is no genuine

9  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

10  Civ. P. 56(a). A party asserting that a fact cannot be disputed must support the assertion by

11  "citing to particular parts of materials in the record, including depositions, documents,

12  electronically stored information, affidavits or declarations, stipulations (including those made for

13  purposes of the motion only), admissions, interrogatory answers, or other materials. . ." Fed. R.

14  Civ. P. 56(c)(1)(A).

15       Summary judgment should be entered, after adequate time for discovery and upon motion,

16  against a party who fails to make a showing sufficient to establish the existence of an element

17  essential to that party's case, and on which that party will bear the burden of proof at trial. See

18  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[A] complete failure of proof concerning an

19  essential element of the nonmoving party's case necessarily renders all other facts immaterial."

20  Id.

21       If the moving party meets its initial responsibility, the burden then shifts to the opposing

22  party to establish that a genuine issue as to any material fact actually does exist. See Matsushita

23  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the

24  existence of this factual dispute, the opposing party may not rely upon the allegations or denials

25  of their pleadings but is required to tender evidence of specific facts in the form of affidavits,

26  and/or admissible discovery material, in support of its contention that the dispute exists or show

27  that the materials cited by the movant do not establish the absence of a genuine dispute. See Fed.

28  R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the

1   fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

2   governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv.,

3   Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is

4   genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving

5   party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

6       In the endeavor to establish the existence of a factual dispute, the opposing party need not

7   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

8   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

9   trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

10  the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

11  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

12  amendments).

13      In resolving the summary judgment motion, the evidence of the opposing party is to be

14  believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the

15  facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475

16  U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

17  obligation to produce a factual predicate from which the inference may be drawn.  See Richards

18  v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

19  (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than

20  simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record

21  taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

22  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

23      III.    Defendants' Motion for Summary Judgment

24      As an initial matter, the court notes that plaintiff has withdrawn her claims against all

25  defendants under the FMLA and FRA, and her claims under the ADA and FEHA against

26  defendants Carretti, Hanson, and Nunes.  Accordingly, the only claims left in dispute are

27  plaintiff's ADA and FEHA claims against TPMG, and claims for intentional infliction of

28  emotional distress and wrongful termination against all defendants.

1        A.      ADA/FEHA Claims

2        Plaintiff's first through fourth causes of action concern violations of the ADA and FEHA

3    with regard to whether TPMG failed to provide plaintiff with a reasonable accommodation and

4    whether it engaged in the interactive process in good faith.

5                    1.      Failure to Accommodate

6        Plaintiff asserts in her first and second causes of action that TPMG failed to provide her a

7    reasonable accommodation in violation of the ADA and FEHA.

8        The ADA prohibits discrimination against a "qualified individual with a disability on the

9    basis of disability in regard to job application procedures, the hiring, advancement, or discharge

10   of employees, employee compensation, job training, and other terms, conditions, and privileges of

11   employment." 42 U.S.C. § 12112(a). "'[Q]ualified individual with a disability' means an

12   individual with a disability who, with or without reasonable accommodation, can perform the

13   essential functions of the employment position that such individual holds or desires." 42 U.S.C. §

14   12111(8).  Under the ADA, an employer discriminates against a qualified individual with a

15   disability by "not making reasonable accommodations to the known physical or mental

16   limitations of [the] otherwise qualified individual with a disability who is an . . . employee, unless

17   [the employer] can demonstrate that the accommodation would impose an undue hardship on the

18   operation of the business of [the employer]." 42 U.S.C. § 12112(b)(5)(A).  Similarly, the FEHA

19   makes it unlawful for an employer "to fail to make reasonable accommodation for the known

20   physical or mental disability of an . . . employee," unless the employer can demonstrate that

21   accommodation will "produce undue hardship" to its operation.  Cal. Gov't Code § 12940(m).

22   The elements of a failure to accommodate claim under both the ADA and FEHA are "(1) the

23   plaintiff has a disability under the [ADA and] FEHA, (2) the plaintiff is qualified to perform the

24   essential functions of the position, and (3) the employer failed to reasonably accommodate the

25   plaintiff's disability." Scotch v. Art Inst. of Cal.-Orange Cty., Inc., 173 Cal.App.4th 986, 1009-

26   10 (2009); Griffin v. United Parcel Serv., Inc., 661 F.3d 216, 222 (5th Cir. 2011).

27   /////

28   /////

10

1    An employer cannot prevail at summary judgment against a claim it failed to

2    accommodate an admittedly disabled employee unless it is able to establish through undisputed

3    facts that "(1) reasonable accommodation was offered and refused; (2) there simply was no

4    vacant position within the employer's organization for which the disabled employee was qualified

5    and which the disabled employee was capable of performing with or without accommodation; or

6    (3) the employer did everything in its power to find a reasonable accommodation, but the

7    informal interactive process broke down because the employee failed to engage in discussions in

8    good faith." Jensen v. Wells Fargo Bank, 85 Cal. App. 4th 245, 262 (2000).  Although an

9    accommodation for an employee's disability is neither "reasonable" nor required if it works an

10   undue burden on the employer's organization, to prevail on this defense the employer may not

11   merely assert such hardship.  Rather, the employer must produce evidence that an accommodation

12   is objectively unreasonable under the circumstances.  Gosvener v. Coastal Corp., 51 Cal. App. 4th

13   805, 813 (1996); Cal. Gov. Code, § 12926(s); Cal. Code Regs., tit. 2, § 7293.9(b).

14       In this case, defendants do not dispute in their motion that plaintiff was disabled within

15   the meaning of both the ADA and FEHA, or that plaintiff was qualified to perform her job.

16   Rather, they argue that TPMG is entitled to summary judgment because plaintiff's requested

17   accommodations were not reasonable.

18       Dr. Hellman provided TPMG with letters on both October 10, 2011 and October 18, 2011

19   stating that plaintiff could return to work on the condition that she either be "restricted from

20   visual/verbal contact and from being directly supervised by current supervisor," or be relocated to

21   an alternate worksite.  (Hiatt Declaration ¶¶ 6-7, Exhs. 2-3.)  TPMG interpreted the request for

22   restricted contact to mean that plaintiff should be held completely "out of sight and sound of her

23   supervisor."  (ECF No. 34-1 at 10.)  This requested accommodation was denied after it was

24   determined that it would be unreasonable because the location of plaintiff's work site and the fact

25   that plaintiff's supervisor, Tracy Nunes, regularly traveled between buildings meant that TPMG

26   would have to restructure the management of the department plaintiff worked in if it were to

27   provide such an accommodation.  Plaintiff argues that TPMG incorrectly interpreted this request

28   and asserts that what Dr. Hellman meant by "restricted contact" was that plaintiff be restricted

1    from all but incidental contact, meaning plaintiff could have visual and verbal contact with Nunes

2    outside of direct supervision.

3        Even if plaintiff's interpretation of this restriction is taken as true, such a request is

4    functionally identical to a request that plaintiff be given a new supervisor, which is per se

5    unreasonable.  The *EEOC Enforcement Guidance on Reasonable Accommodation and Undue*

6    *Hardship Under the Americans with Disabilities Act*, Question 33, states: "[a]n employer does not

7    have to provide an employee with a new supervisor as a reasonable accommodation."  1999 WL

8    33305876, at *24 (Oct. 17, 2002).  Furthermore, the great majority of courts, both within the

9    Ninth Circuit and elsewhere, have held that employers are not required to provide an employee

10   with a different supervisor as an accommodation as a matter of law.  See, e.g., Gaul v. Lucent

11   Technologies Inc., 134 F.3d 576, 581 (3d Cir. 1998) ("[B]y asking to be transferred away from

12   individuals who cause him prolonged and inordinate stress, [plaintiff] is essentially asking this

13   court to establish the conditions of his employment, most notably, with whom he will work.

14   However, nothing in the ADA allows this shift in responsibility.") (citation and quotation marks

15   omitted); Weiler v. Household Fin. Corp., 101 F.3d 519, 526 (7th Cir. 1996) ("The ADA does not

16   require HFC to transfer Weiler to work for a supervisor other than Skorupka . . . ."); Alsup v. U.S.

17   Bancorp, 2015 WL 224748, at *8 (E.D. Cal. Jan. 15, 2015) (dismissing plaintiff's reasonable

18   accommodation claim under FEHA because "plaintiff's requested accommodation, transfer to a

19   new position under a new supervisor, is unreasonable as a matter of law"); Gazzano v. Stanford

20   Univ., 2014 WL 794803, at *4, n.59 (N.D. Cal. Feb. 27, 2014) (noting that even if plaintiff had

21   properly raised a request for transfer to a new supervisor as an accommodation, such an

22   accommodation was per se unreasonable); Adams v. Alderson, 723 F. Supp. 1531, 1531-32

23   (D.D.C. 1989), aff'd sub nom., Adams v. G.S.A., 1990 WL 45737 (D.C. Cir. Apr. 10, 1990) (the

24   requested accommodation, transfer of plaintiff or supervisor or both, "is clearly not one

25   reasonably expected of [the employer]").  But see Kennedy v. Dresser Rand Co., 193 F.3d 120,

26   122-23 (2d Cir. 1999) (declining to adopt a rule finding request for transfer to a new supervisor to

27   be unreasonable as a matter of law, but finding a rebuttable presumption that such a transfer is an

28

1    unreasonable accommodation).  Accordingly, this requested accommodation was per se

2    unreasonable and TPMG properly denied it.

3         Plaintiff's second requested accommodation, that TPMG relocate her to another work site,

4    was also per se unreasonable under the circumstances presented by the evidence.  Generally,

5    under both the ADA and the FEHA, "reassignment to a vacant position" is considered a

6    reasonable accommodation.  42 U.S.C. § 12111(9)(B); Cal. Gov't Code § 12926.  However, when

7    a request for such an accommodation directly conflicts with the collectively-bargained seniority

8    rights of other employees, the request is per se unreasonable.  Willis v. Pac. Mar. Ass'n, 244 F.3d

9    675, 682 (9th Cir. 2001).  Nevertheless, a request may still be reasonable when the language of

10   the collective bargaining agreement is flexible enough to permit the accommodation under the

11   circumstances.  Id.; see Buckingham v. United States, 998 F.2d 735, 741 (9th Cir. 1993) (holding

12   that under the Rehabilitation Act, which contains provisions similar to the ADA, transfer of a

13   disabled employee would not conflict with the collective bargaining agreement which contained

14   an exception to seniority rules for "the most unusual of circumstances").

15        Defendants assert that this request was denied because the CBA between TPMG and

16   plaintiff's union required that vacant positions be filled on the basis of seniority and that the

17   CBA's seniority provision would have been violated had TPMG simply granted the request and

18   moved plaintiff to an open job at one of its other sites.  Defendants argue that TPMG's denial was

19   proper because the CBA's terms made plaintiff's request per se unreasonable.  Plaintiff argues

20   that her request for this accommodation was not in direct conflict with the CBA because TPMG

21   could have worked with her to identify available positions at other job sites for which plaintiff

22   was qualified and then have her bid for such a position.  Plaintiff further asserts that TPMG could

23   have, in the alternative, sought a variance from the union with regard to the CBA's seniority

24   placement provision in order to get around the requirement.

25        Plaintiff's assertion that defendant could have worked with plaintiff to secure her a

26   position within the confines of the seniority system dictated by the CBA is not supported by the

27   evidence.  Plaintiff fails to point to any evidence that indicates that TPMG had vacant positions at

28   other sites for which plaintiff would have been qualified, or that such vacancies would become

1    available in the near future.  See Kotwica v. Rose Packing Co., 637 F.3d 744, 750 (7th Cir. 2011)

2    ("[P]laintiffs, when alleging that an employer's failure to reassign them violated the ADA's anti-

3    discrimination provisions, bear the burden of showing that there is a vacant position in existence

4    for which they are qualified.")  Furthermore, plaintiff merely notes that she had roughly nine

5    years of seniority, but provides no evidence that this would have been sufficient to secure an open

6    position had she entered a bid.  See Schmidt v. Safeway Inc., 864 F. Supp. 991, 997 (D. Or. 1994)

7    ("An employer is not required to offer an accommodation that is likely to be futile . . .");  Hanson

8    v. Lucky Stores, Inc., 74 Cal. App. 4th 215, 226 (1999).  The evidence in the record shows only

9    that plaintiff requested relocation as an accommodation and that the CBA to which both plaintiff

10   and TPMG were bound imposed a seniority system that required employees to bid on an open

11   position that would be awarded to the most senior employee who entered a bid.  Plaintiff fails to

12   create a genuine issue of material fact regarding her reassignment request because she is unable to

13   rebut defendants' evidentiary showing that her relocation would have violated the collectively-

14   bargained seniority system.

15        Plaintiff's second argument, that TPMG could have sought a variance, is also not well

16   taken.  Plaintiff provides no evidence that the terms of the CBA were flexible enough to permit

17   such a break from the standard seniority rules.  In fact, the only evidence concerning the terms of

18   the CBA shows that the positions at other job sites were awarded based on seniority; the evidence

19   provides no indication that any deviation from the CBA's provision requiring seniority-based

20   placements was permitted.  Furthermore, contrary to plaintiff's contention, TPMG was not

21   required to approach the union regarding a variance before the request could be deemed

22   unreasonable.  In U.S. Airways, Inc. v. Barnett, the United States Supreme Court held that for an

23   ADA claim based on an employer's failure to provide reasonable accommodation, "a showing

24   that the assignment would violate the rules of a seniority system warrants summary judgment for

25   the employer" unless the plaintiff can present evidence of "special circumstances surrounding the

26   particular case that demonstrate the assignment is nonetheless reasonable."  535 U.S. 391, 406

27   (2002).  This interpretation of the ADA also applies to plaintiff's claim under the FEHA.  See

28   Alsup, 2015 WL 224748, at *8 (citing Hastings v. Dep't of Corr., 110 Cal. App. 4th 963, 973

14

1    (2003)) ("[C]ases interpreting the ADA are persuasive authority for interpreting the FEHA.").

2    Here, defendants have provided evidence that reassigning plaintiff to a different site would have

3    violated the terms of the CBA, and plaintiff presents no evidence demonstrating the existence of

4    special circumstances to rebut this showing.  Accordingly, plaintiff's second request for

5    accommodation was also per se unreasonable.

6            Furthermore, as discussed in further detail below with respect to plaintiff's interactive

7    process claims under the ADA and FEHA, plaintiff and her doctors never provided TPMG with

8    information regarding plaintiff's workplace restrictions, thus leaving TPMG with insufficient

9    information to allow it to discern and propose alternative accommodations beyond the two

10   unreasonable accommodations provided by plaintiff.  The undisputed facts show that TPMG sent

11   plaintiff letters on multiple occasions requesting information from her and her treating physicians

12   concerning the workplace limitations imposed by her condition.  Despite these efforts, plaintiff

13   never provided the requested information that would have aided TPMG in finding a reasonable

14   accommodation for plaintiff.  Given the lack of information regarding plaintiff's disability and

15   the limitations it imposed, TPMG could not have reasonably been expected to develop and

16   propose alternative accommodations.  See Beck v. Univ. of Wisconsin Bd. of Regents, 75 F.3d

17   1130, 1137 (7th Cir. 1996) ("Because the University was never able to obtain an adequate

18   understanding of what action it should take, it cannot be held liable for failure to make

19   'reasonable accommodations.'"); 29 C.F.R. § Pt. 1630, App. ("[I]n some instances neither the

20   individual requesting the accommodation nor the employer can readily identify the appropriate

21   accommodation. . . . [T]he employer may not know enough about the individual's disability or the

22   limitations that disability would impose on the performance of the job to suggest an appropriate

23   accommodation.").  Accordingly, because the facts demonstrate that the only two

24   accommodations suggested by plaintiff were per se unreasonable and TPMG was not provided

25   with information sufficient to develop and propose alternative accommodations, TPMG is entitled

26   to summary judgment with respect to plaintiff's reasonable accommodation claims under the

27   ADA and FEHA.

28   /////

1          2.      Failure to Engage in the Interactive Process

2          Plaintiff asserts in her third and fourth causes of action that TPMG failed to engage in the

3  interactive process in good faith in violation of the ADA and FEHA.

4          Under the ADA, once an employee requests an accommodation, "the employer must

5  engage in an interactive process with the employee to determine the appropriate reasonable

6  accommodation." Zivkovic v. S. California Edison Co., 302 F.3d 1080, 1089 (9th Cir. 2002).

7  Similarly, under the FEHA, it is unlawful for an employer "to fail to engage in a timely, good

8  faith, interactive process with the employee . . . to determine effective reasonable

9  accommodations, if any, in response to a request for reasonable accommodation by an employee

10  . . . with a known physical or mental disability or known medical condition." Cal. Gov't Code §

11  12940(n). "The interactive process requires: (1) direct communication between the employer and

12  employee to explore in good faith the possible accommodations; (2) consideration of the

13  employee's request; and (3) offering an accommodation that is reasonable and effective." Id.

14  "'Liability for failure to provide reasonable accommodations ensues only where the employer

15  bears responsibility for the breakdown' in the interactive process." Id. (quoting Beck, 75 F.3d at

16  1137). "In order to demonstrate good faith, employers can point to cooperative behavior which

17  promotes the identification of an appropriate accommodation. Employers should 'meet with the

18  employee who requests an accommodation, request information about the condition and what

19  limitations the employee has, ask the employee what he or she specifically wants, show some sign

20  of having considered employee's request, and offer and discuss available alternatives when the

21  request is too burdensome.'" Barnett v. U.S. Air, Inc., 228 F.3d 1105, 1114 (9th Cir. 2000)

22  (quoting Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 317 (3d Cir. 1999)), vacated on other

23  grounds, U.S. Airways, Inc. v. Barnett, 535 U.S. 391 (2002).

24          Defendants argue that the undisputed evidence shows that plaintiff was the one who bore

25  responsibility for the breakdown in the interactive process and that TPMG made numerous

26  attempts to interact with and obtain information from plaintiff and her treating physicians in an

27  attempt to discern the limitations caused by plaintiff's disability and what accommodations could

28  be reasonably made to allow her to return to work. Plaintiff asserts that the evidence provides a

16

1   genuine dispute as to whether TPMG was at fault for the breakdown in the interactive process

2   because it shows that TPMG did not do everything in its power to find a reasonable

3   accommodation for plaintiff once she began the interactive process.  For the reasons stated below,

4   the undisputed evidence shows that TPMG engaged plaintiff in the interactive process in good

5   faith and made a number of reasonable attempts to obtain information from plaintiff that was

6   necessary to determine whether it could provide plaintiff with a reasonable accommodation.

7           Plaintiff triggered the interactive process on October 10, 2011 when Dr. Hellman provided

8   TPMG with the first work status report indicating that plaintiff could return to work if she were

9   restricted from verbal and visual contact with Nunes or was relocated to a job at another site.  On

10  October 13, 2011, Carretti called plaintiff regarding this report and informed her that TPMG

11  could not provide plaintiff with these requested accommodations.  Plaintiff contends that this

12  initial denial shows that TPMG failed to act in good faith because it denied plaintiff's requests

13  without seeking clarification from plaintiff's physician concerning what was meant by "restricted

14  contact" with her supervisor or proposing any alternative accommodations.  However, for the

15  reasons noted above, both accommodations plaintiff requested were per se unreasonable even

16  when plaintiff's interpretation of what was requested is accepted as true.  Furthermore, while Dr.

17  Hellman's October 11, 2011 report provided proposed accommodations; it provided no

18  discussion of plaintiff's actual limitations.  Without information concerning plaintiff's limitations,

19  TPMG could not have been reasonably expected to provide alternative accommodations at that

20  juncture.  See Barnett, 228 F.3d at 1114 ("Both sides must communicate directly, exchange

21  essential information and neither side can delay or obstruct the process."); Beck, 75 F.3d at 1135

22  ("A party that fails to communicate, by way of initiation or response, may . . . be acting in bad

23  faith.").

24          On October 18, 2011, Dr. Hellman provided TPMG with a second report that set forth the

25  exact same accommodations that were noted in the October 11, 2011, report.  The report stated

26  that if such accommodations could not be provided, plaintiff would be considered unable to work

27  through November 20, 2011.  On November 2, 2011, Hiatt called and left a message with Dr.

28  Hellman requesting clarification of plaintiff's physical and psychological limitations.  Dr.

17

1   Hellman responded on November 9, 2011, and told Hiatt that he could not comment on plaintiff's

2   restrictions because plaintiff had been transferred to a new doctor.  On November 18, 2011, Dr.

3   Greenberg, plaintiff's new doctor, provided TPMG with a note indicating that plaintiff was

4   unable to return to work until December 20, 2011.  On December 19, 2011, Hiatt sent plaintiff a

5   letter informing plaintiff that TPMG had a return to work program that would allow plaintiff to

6   work as she continued her recovery and requesting plaintiff to provide an updated certification

7   from her doctor indicating her work restrictions, "if applicable," by no later than December 30,

8   2011 so TPMG could begin the return to work process.  (Hiatt Declaration, Exh.5.)  On

9   December 23, 2011, Dr. Greenberg faxed a letter to TPMG indicating that plaintiff was unable to

10  work until February 1, 2012.  The letter did not include any indication of plaintiff's restrictions.

11  Plaintiff later called Hiatt regarding the December 19, 2011 letter.  Hiatt explained to plaintiff that

12  TPMG's return to work program was available to her if her doctor indicated that she was able to

13  return to work with restrictions.  Plaintiff replied that she was unable to return to work at that

14  time.

15          Between January and October of 2012, plaintiff's treating physicians provided TPMG

16  with eight letters stating that plaintiff could not return to work.  None of these letters contained

17  any indication as to what plaintiff's restrictions were.  Also during this period, Hiatt sent plaintiff

18  two more letters again offering TPMG's return to work program and to work with plaintiff in

19  finding an accommodation.  In the second of these letters, Hiatt stated that TPMG needed

20  information concerning plaintiff's limitations so TPMG could work with her to develop

21  accommodations that would allow her to return to work.  Hiatt also informed plaintiff that her

22  leave would expire under the CBA on November 5, 2012, and that Hiatt would like to work with

23  plaintiff in finding an accommodation prior to this date.  Hiatt enclosed a letter requesting a

24  description of plaintiff's work restrictions for plaintiff to give her doctor.   Plaintiff did not

25  respond to either of these letters and continued to submit letters from her doctors that only stated

26  that plaintiff could not return to work.

27  /////

28  /////

18

1    On October 31, 2012, Hiatt sent plaintiff another letter noting that she wanted to work

2   with plaintiff in finding a reasonable accommodation, but first needed information concerning

3   plaintiff's restrictions and ability to return to work.  Hiatt also wrote that if plaintiff did not

4   respond, she would assume plaintiff did not wish to engage in the interactive process and that

5   TPMG would cease its efforts to engage with her.  Plaintiff called Hiatt on November 7, 2012.

6   During this conversation, Hiatt again instructed plaintiff on the interactive process.  Plaintiff

7   stated that she "was confused a lot" and did not "know what [was] going [on]."  (Hiatt

8   Deposition, Exh. 28.)  Plaintiff further told Hiatt to "just see my dr." and that she "d[id] not want

9   to engage in [the] process."[5]  (Id.)  Hiatt sent plaintiff another letter on November 15, 2012, as a

10  follow up to their phone conversation.  In this letter, Hiatt reiterated what was stated during the

11  phone conversation, including plaintiff's statement that she was not interested in the interactive

12  process.  Hiatt also instructed plaintiff to contact her doctor so she could obtain information

13  regarding her restrictions by no later than November 23, 2012.  Finally, Hiatt warned plaintiff that

14  if such information had not been provided by that date, then TPMG would assume that plaintiff

15  was not interested in pursuing the interactive process.  Plaintiff did not respond to this letter

16  before November 23, 2012.

17    On December 13, 2012, Dr. Greenberg sent TPMG a letter stating that plaintiff had given

18  him the November 15, 2012 letter, that plaintiff's condition precluded her from work, and that he

19  hoped to later return plaintiff to work with the condition that she be precluded from contact with

20  her supervisor or be transferred to another job site.  However, the note did not contain any

21  information regarding plaintiff's functional workplace restrictions.  This was the last doctor's

22  note provided by plaintiff prior to her termination.

23    These undisputed facts show that plaintiff bore the responsibility for the breakdown in the

24  interactive process.  Moreover, they show that TPMG engaged in a good faith effort to engage

25  with plaintiff in the interactive process in order to discern her limitations and potentially fashion a

26  reasonable accommodation that would allow her to return to work.  TPMG attempted to reach out

27

28  ───────────────
    [5] Plaintiff's statement that she did not wish to engage in the interactive process is corroborated by
    the fact that she filed the complaint in the instant action on October 5, 2012.  ECF No. 1.

1    to plaintiff and her doctors concerning the limitations caused by her disability numerous times in

2    an attempt to obtain information regarding plaintiff's functional limitations, which was necessary

3    for TPMG to evaluate whether it could provide plaintiff with a reasonable accommodation.  The

4    undisputed evidence makes it clear that neither plaintiff nor her doctors provided this information.

5    Because TPMG was never able to obtain an adequate understanding of what action it should take,

6    it cannot be held liable under the circumstances for a failure on its part to develop and propose

7    reasonable accommodations for plaintiff.  See Beck, 75 F.3d at 1136 ("Where the missing

8    information is of the type that can only be provided by one of the parties, failure to provide the

9    information may be the cause of the breakdown and the party withholding the information may be

10   found to have obstructed the process."); 29 C.F.R. § 1630.2(o)(3) ("[The interactive] process

11   should identify the precise limitations resulting from the disability and potential reasonable

12   accommodations that could overcome those limitations.").

13          Plaintiff argues that TPMG already had all the information regarding her limitations in

14   October of 2011 when Dr. Hellman provided his initial letter.  However, there is no evidence that

15   plaintiff or her doctors provided information regarding her functional limitations at that time, or at

16   any time between her initialization of the interactive process and her termination.  Plaintiff's

17   disability, which resulted from anxiety, depression, and other mental distress, made it essential

18   that TPMG have information regarding plaintiff's limitations before it could have reasonably

19   been expected to readily identify an appropriate accommodation for plaintiff because the nature

20   of the disability did not obviously indicate what plaintiff's functional limitations might have been.

21   The undisputed facts show that TPMG had only information that plaintiff was under her

22   physicians' care, requested restrictions in the form of limited contact with her supervisor or

23   relocation to another work site, and that her condition precluded her from returning to work if

24   such accommodations could not be provided.  TPMG was not required to speculate as to what a

25   reasonable accommodation might be based on the little information it possessed. See Willis, 244

26   F.3d at 682 (quoting 42 U.S.C. § 12112(b)(5)(A)) ("The ADA protects a disabled person by

27   prohibiting affected employers from 'not making reasonable accommodations to the *known*

28   *physical or mental limitations* of an otherwise qualified [employee] with a disability . . . .'")

1    (emphasis added).  Furthermore, TPMG's numerous requests to obtain information regarding

2    plaintiff's limitations demonstrates that it acted in good faith to further the interactive process and

3    determine whether a reasonable accommodation could be fashioned so plaintiff could return to

4    work.  Taylor, 184 F.3d at 317 ("[A]n employer cannot be faulted if after conferring with the

5    employee to find possible accommodations, the employee then fails to supply information that the

6    employer needs or does not answer the employer's request for more detailed proposals.").

7            Plaintiff also argues that a genuine issue of material fact exists as to whether her failure to

8    provide TPMG with the requested information regarding her limitations makes her at fault for the

9    breakdown because the evidence shows that plaintiff's condition continued to decline, such that

10   by November of 2012, she was suffering from extreme confusion that caused her to not

11   understand what she had to do to continue the process.[6]  However, even if plaintiff's confusion

12   limited her responsibility for the break down; it does not negate the fact that the undisputed

13   evidence shows that defendant fulfilled its duty to engage in a timely, good faith interactive

14   process with plaintiff under the circumstances.  See Beck, 75 F.3d at 1137 ("Liability for failure

15   to provide reasonable accommodations ensues only where the employer bears responsibility for

16   the breakdown.  But where . . . the employer does not obstruct the process, but instead makes

17   reasonable efforts both to communicate with the employee and provide accommodations based on

18   the information it possessed, ADA liability simply does not follow."); Taylor, 184 F.3d at 317

19   ("All the interactive process requires is that employers make a good-faith effort to seek

20   accommodations.").

21           Finally, plaintiff contends that there is a genuine factual issue as to whether TPMG

22   fulfilled its duty to engage in the process because the first two of Hiatt's letters sent in 2012

23   included ambiguous requests for more information that could be construed to mean that TPMG

24   wanted plaintiff to provide additional information only "if [plaintiff's] situation had changed."

25   (ECF No. 37 at 14.)  However, even after TPMG began to send plaintiff letters with what plaintiff

26   admits to be unambiguous requests for more information in August of 2012, plaintiff still failed to

27

28   _____
     [6] Again, the court is skeptical of this claim as plaintiff was clearly not so confused as to be
     incapable of filing a federal complaint to initiate this proceeding.

1   provide TPMG with the requested information.  Accordingly, even if the first two letters

2   contained conditional requests, they would not change who was liable for the breakdown because

3   defendant continued to request the information and plaintiff failed to provide it.

4       Given the circumstances presented by the undisputed evidence, no reasonable juror could

5   find that TPMG acted in bad faith in attempting to engage with plaintiff or that TPMG was the

6   party that caused the process to break down.  Accordingly, summary judgment will be granted

7   with respect to plaintiff's third and fourth causes of action.

8                    B.    Intentional Infliction of Emotional Distress

9       Plaintiff asserts in her fifth cause of action that all defendants are liable for intentional

10  infliction of emotional distress for their respective conduct in dealing with plaintiff during the

11  events stemming from plaintiff's needle prick incident.  In her opposition, plaintiff states that she

12  bases her emotional distress claim on the following conduct: (1) "[d]efendants improperly

13  inquired into plaintiff's medical appointments and revealed what plaintiff believed to be protected

14  information at an attendance meeting"; (2) Nunes verbally warned plaintiff at an attendance

15  meeting that plaintiff had attendance problems and that if those problems continued, plaintiff

16  might be terminated; (3) defendants refused to provide plaintiff's disability insurance company

17  with a required statement regarding the hours she had worked for TPMG; and (4) individual

18  defendants falsely claimed that plaintiff was faking disability and encouraged TPMG to decline a

19  grant of plaintiff's requested accommodations.  (ECF No. 37 at 20.)

20      To prevail on a cause of action for intentional infliction of emotional distress under

21  California law, a plaintiff must prove: (1) outrageous conduct by the defendant, (2) the

22  defendant's intention of causing or reckless disregard of the probability of causing emotional

23  distress, (3) the plaintiff's suffering severe or extreme emotional distress, and (4) actual and

24  proximate causation of the emotional distress by the defendant's outrageous conduct.  Cervantes

25  v. J.C. Penney Co., 24 Cal.3d 579, 593 (1979).  In order for a defendant's conduct to be

26  considered "outrageous," such conduct must be so extreme as to "exceed[ ] the bounds of what is

27  generally tolerated in a civilized society."  Braunling v. Countrywide Home Loans Inc., 220 F.3d

28  1154, 1158 (9th Cir. 2000).  "Conduct which exhibits mere rudeness and insensitivity does not

1    rise to the level required for a showing of intentional infliction of emotional distress." <u>Id.</u>  Rather,

2    the conduct should create a condition for the plaintiff that "no reasonable [person] in a civilized

3    society should be expected to endure." <u>Fletcher v. Western Nat'l Life Ins. Co.</u>, 10 Cal. App.3d

4    376, 397 (1970).  "Whether a defendant's conduct can reasonably be found to be outrageous is a

5    question of law that must initially be determined by the court; if reasonable persons may differ, it

6    is for the jury to determine whether the conduct was, in fact, outrageous." <u>Berkley v. Dowds</u>, 152

7    Cal. App. 4th 518, 534 (2007) (citing <u>Alcorn v. Anbro Engineering, Inc.</u>, 2 Cal.3d 493, 499

8    (1970)).

9         Furthermore, under California's Workers' Compensation Act, workers' compensation

10   generally provides the exclusive remedy for emotional distress arising from the workplace.  <u>Cole</u>

11   <u>v. Fair Oaks Fire Protection Dist.</u>, 43 Cal.3d 148, 160 (1987); <u>Livitsanos v. Superior Court</u>, 2 Cal.

12   4th 744, 756 (1992).  However, an exception to this general rule exists when the employer's

13   conduct "contravenes fundamental public policy . . . [or] exceeds the risks inherent in the

14   employment relationship." <u>Livitsanos</u>, 2 Cal. 4th at 754.  "Emotional distress caused by

15   misconduct in employment relations involving . . . promotions, demotions, criticism of work

16   practices, negotiations as to grievances, is [considered] a normal part of the employment

17   environment.  A cause of action for such a claim is barred by the exclusive remedy provisions of

18   the workers' compensation law." <u>Accardi v. Superior Court</u>, 17 Cal. App. 4th 341, 352 (1993)

19   (citing <u>Cole</u>, 43 Cal.3d at 160).

20        Here, defendants argue that all the conduct plaintiff points to in support of her emotional

21   distress claim cannot reasonably be found to be outrageous as a matter of law.  Defendants further

22   contend that workers' compensation provides the exclusive remedy for this claim because all of

23   the complained-of conduct arises from defendants' workplace actions.  Plaintiff contends that

24   summary judgment on this claim should be denied because a reasonable jury could find

25   defendants' conduct sufficiently outrageous, plaintiff's emotional distress is non-compensable

26   under the workers' compensation law, and there exists a genuine dispute as to whether

27   defendants' conduct occurred as a normal part of the employment relationship.

28

1    With regard to the claim that defendants improperly inquired into plaintiff's medical

2    appointments, the evidence shows that Nunes told plaintiff during an attendance meeting that she

3    had contacted plaintiff's workers' compensation administrator and was told that plaintiff had

4    gone to a doctor's appointment on July 20, 2011, rather than on July 21, 2011, as plaintiff had

5    claimed.  This does not amount to "outrageous" conduct as a matter of law.  Plaintiff bases this

6    claim only on the *belief* that the information Nunes obtained from plaintiff's doctor and revealed

7    during this meeting was protected by law and that revealing the information in this manner was

8    improper.  There is no evidence in the record that this violated HIPAA or any other privacy law,

9    that Nunes obtained and revealed other medical information about plaintiff, or that Nunes

10   contacted plaintiff's doctor directly to obtain this information.  Furthermore, Nunes' inquiry into

11   this subject was in furtherance of obtaining information concerning plaintiff's attendance record

12   and, thus, was workplace conduct that falls into the exclusivity provision of California's Worker's

13   Compensation Act.  See Accardi, 17 Cal. App. 4th at 352-53 (1993).

14   With respect to plaintiff's second claim of conduct, the evidence shows that during the

15   September 20, 2011 follow up attendance meeting with plaintiff, Nunes gave plaintiff a verbal

16   warning and made a statement that should plaintiff face attendance problems in the future, she

17   might be terminated.  Plaintiff claims that this conduct was outrageous because all of the absences

18   discussed during this meeting were ultimately found to be protected absences.  However,

19   "conduct, including misconduct, relating to . . . criticism of work practices is usually considered a

20   normal part of the employment environment and thus barred by the exclusivity provisions of

21   California's worker's compensation law."  Accardi, 17 Cal. App. 4th at 352-53.  Therefore, a

22   claim based on this conduct is barred as a matter of law.  Furthermore, simple pleading of

23   personnel mismanagement is insufficient to support an emotional distress claim, even if improper

24   motivation is alleged.  See Janken v. GM Hughes Electronics, 46 Cal. App. 4th 55, 80 (1996)

25   ("Managing personnel is not outrageous conduct beyond the bounds of human decency . . .").

26   Plaintiff's third basis for her emotional distress claim, that defendants failed to complete

27   and provide required forms to MetLife, plaintiff's disability insurance company, also lacks any

28   evidentiary support.  There is no evidence that defendant TPMG's representatives failed to

24

1    complete and send the forms to MetLife.  In fact, the only evidence plaintiff cites to in support of

2    her contention shows that MetLife received the requested information from defendants, including

3    plaintiff's wage records.  A letter dated November 29, 2012 sent to plaintiff from MetLife notes

4    that TPMG sent MetLife documentation concerning plaintiff's pre-disability hours and hourly

5    wages.  (Meredith Declaration, Exh. 12.)  Plaintiff appears to argue that her claim is based on the

6    contention that the information TPMG supplied regarding plaintiff's hours was false and that

7    TPMG failed to provide MetLife with updated information indicating that plaintiff worked an

8    average of more than twenty hours per week.  However, nothing in the record supports a

9    contention that the information supplied to MetLife to TPMG was false or that TPMG's failure to

10   provide MetLife with additional information concerning plaintiff's wages somehow amounted to

11   extreme or outrageous conduct under the circumstances.

12          Finally, plaintiff argues that the individual defendants acted outrageously by falsely

13   claiming that plaintiff was faking disability and encouraging TPMG to decline plaintiff's

14   requested accommodations.  The only evidence plaintiff provides in support of this claim is an

15   email written on November 23, 2011 by Hanson to two other TPMG employees concerning one

16   of plaintiff's requests for continued medical leave that includes the following statement: "Kaiser

17   HAS to develop a way of dealing more effectively with these sorts of, what I consider to be

18   bogus, time off notes."  (Hanson Deposition, Exh. 13.)  The undisputed evidence shows that this

19   communication could not have had any effect on TPMG's decision to decline plaintiff's requested

20   accommodations because Carretti had already informed plaintiff that TPMG had reviewed and

21   declined her requests for accommodation prior to the date Hanson sent this email.  Furthermore,

22   even when the evidence is viewed in a light most favorable to plaintiff, a reasonable jury might

23   find that Hanson's comment demonstrated, at most, rudeness and insensitivity on her part; it was

24   not conduct so extreme as to "exceed[ ] the bounds of what is generally tolerated in a civilized

25   society."  Braunling, 220 F.3d at 1158.  Summary judgment is appropriate on this claim.

26                        C.    Wrongful Termination Claim

27          Finally, plaintiff asserts in her eighth cause of action that defendants terminated her from

28   her employment with TPMG in violation of public policy.  Plaintiff bases this claim on

1    defendants' alleged violations of FEHA.  Defendants argue that they should be granted summary

2    judgment with respect to this claim because the claim is derivative of plaintiff's reasonable

3    accommodation and interactive process claims under FEHA to which defendants are entitled to

4    summary judgment.

5            "Under California common law, although 'an at-will employee may be terminated for no

6    reason, or for an arbitrary or irrational reason, there can be no right to terminate for an unlawful

7    reason or a purpose that contravenes fundamental public policy.'"  Dep't of Fair Employment &

8    Hous. v. Lucent Technologies, Inc., 642 F.3d 728, 748 (9th Cir. 2011) (quoting Silo v. CHW

9    Med. Found., 27 Cal. 4th 1097, 1104 (2002)).  "The elements for this tort are (1) the existence of

10   a public policy and (2) a nexus between the public policy and an employee's termination."

11   Lucent Technologies, Inc., 642 F.3d at 749 (citing Turner v. Anheuser-Busch, Inc., 7 Cal. 4th

12   1238 (1994)).  Termination stemming from a violation of statutory law, such as the FEHA, may

13   form the basis for a wrongful termination claim.  See Silo, 27 Cal. 4th 1097.

14           "Where courts have granted summary judgment as to the plaintiff's FEHA claims, the

15   courts have concluded that summary judgment is appropriate on the plaintiff's public policy

16   claim."  Stewart v. Boeing Co., 2013 WL 6839370, at *8 (C.D. Cal. Dec. 23, 2013); see

17   Cavanaugh v. Unisource Woldwide, Inc., 2007 WL 915223, at *11 (E.D. Cal. Mar. 26, 2007)

18   (granting summary judgment in favor of employer as to plaintiff's wrongful termination in

19   violation of public policy claim, because it granted summary judgment in favor of employer on

20   plaintiff's age discrimination claim).

21           Defendants correctly assert that plaintiff's claim for wrongful termination in violation of

22   public policy is derivative of her statutory claims under FEHA.  See Nielsen v. Trofholz

23   Technologies, Inc., 750 F. Supp. 2d 1157, 1171 (E.D. Cal. 2010) (citing Jennings v. Marralle, 8

24   Cal. 4th 121, 135-36 (1994)), aff'd, 470 F. App'x 647 (9th Cir. 2012).  Because the Court grants

25   summary judgment on plaintiff's claims asserted under FEHA, summary judgment should be

26   similarly granted on plaintiff's wrongful termination claim.  Accordingly, the court will grant

27   defendant's motion with respect to plaintiff's wrongful termination claim.

28   ////

1    IV.    Conclusion

2        For the reasons discussed above, IT IS HEREBY ORDERED that:

3        1.    Defendants' motion for summary judgment (ECF No. 34) is granted.

4        2.    Judgment is entered for defendants Ronald Carretti, Tracy Nunes, Shirley Hanson,

5    and The Permanente Medical Group, Inc.

6        3.   The Clerk of Court is directed to close this case and vacate all dates.

7    Dated:  February 10, 2015

8                                                _____
                                                CAROLYN K. DELANEY
9                                                UNITED STATES MAGISTRATE JUDGE

10

11   11 Roberts2506.msj

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28